IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:22-CV-42-FL

| | | |
|---|---|---|
| FIRST PROTECTIVE INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| LINDA STOKES RIKE; LEWIS EDWARD O'LEARY; PROBUILDERS OF THE CAROLINAS, INC.; WILLIAM SCOTTE HEIDELBERG; HEIDELBERG AND MULLENS, INC.; RONALD PAUL HICKS; STORMPRO PUBLIC ADJUSTERS, LLC, | ) ) ) ) ) ) ) ) ) | ORDER |
| Defendants. | ) | |

This matter is before the court on motions by defendants Lewis Edward O'Leary ("O'Leary") and ProBuilders of the Carolinas, Inc. (collectively "O'Leary defendants"),[1] for judgment on the pleadings, protective order, and attorney's fees (DE 58, 59, 60). Also pending is plaintiff's motion to compel discovery from the O'Leary defendants (DE 70). The issues raised have been briefed fully and are ripe for ruling. For the following reasons, the O'Leary defendants' motions are denied and plaintiff's motion is granted on the terms set forth herein.

---

[1] For purposes of this order, the court refers to these two defendants collectively as the "O'Leary defendants" because defendant O'Leary is alleged to be the "principal owner, officer, director and registered agent for" defendant ProBuilders of the Carolinas, Inc. (Compl. (DE 5) ¶ 7).

**STATEMENT OF THE CASE**

Plaintiff commenced this action May 13, 2022, arising out of a disputed insurance claim for a water leak in the residence of defendant Linda Stokes Rike ("Rike"). Plaintiff seeks a declaratory judgment vacating an appraisal of loss in the amount of $1,036,000.00 signed by defendants Scott Heidelberg ("Heidelberg") and O'Leary, on the basis that it is invalid due to: 1) conflict of interest and bias of O'Leary ("Count I"), 2) improper coverage and causation determinations made therein ("Count II"), 3) inclusion of expenses not incurred by Rike ("Count III"), and 4) inclusion of loss amounts from separate claims arising from Hurricanes Florence and Dorian ("Count IV").[2]

Plaintiff also asserts three claims for damages against defendants based on their conduct during the appraisal and insurance claim adjustment process: 1) violation of the North Carolina Unfair and Deceptive Trade Practices Act ("Count V"); 2) tortious interference with contract (against all defendants except Rike) ("Count VI"); and 3) civil conspiracy against Rike and defendant Ronald Paul Hicks ("Hicks"), a public adjuster, and his company defendant Stormpro Public Adjusters, LLC ("Count VII"). Finally plaintiff asserts a claim for declaratory judgment against Rike for breach of insurance policy.

---

[2] Plaintiff and defendant Rike were litigants in a prior separate case involving a claim based upon Hurricane Florence damage to the same residence. See No. 4:20-CV-124-D (E.D.N.C.). In an order in that case entered January 28, 2021, the court granted defendant Rike's motion for judgment on the pleadings on a counterclaim for breach of insurance policy, and it also dismissed plaintiff's claim seeking to invalidate an appraisal award premised upon fraud, mistake, or other impeaching circumstances. First Protective Ins. Co. v. Rike, 516 F. Supp. 3d 513, 529 (E.D.N.C. 2021). Defendant Rike's counterclaims for unfair and deceptive trade practices and breach of good faith were allowed to proceed forward, but the parties reached a court-hosted settlement thereafter and the case closed with a stipulation of dismissal on March 11, 2021.

All defendants filed answers to the complaint,[3] and the O'Leary defendants filed an amended answer October 2, 2022.[4] In case management order entered January 12, 2023, the court set a September 29, 2023, deadline for discovery and a December 1, 2023, deadline for dispositive motions. Upon joint motion of the parties, the court extended those deadlines to January 29, 2024, and April 1, 2024, respectively.

In the meantime, the O'Leary defendants filed the instant motions, premised upon defendant O'Leary's asserted immunity from suit and discovery, as well as entitlement to attorney's fees, under the North Carolina Revised Uniform Arbitration Act, N.C. Gen. Stat. §§ 1-569.1 et seq. (hereinafter the "arbitration act"). Plaintiff filed a combined response in opposition, and the O'Leary defendants replied.

Thereafter, plaintiff's counsel notified the court of a discovery dispute, based upon the O'Leary defendants' refusal to participate in discovery on the same basis asserted in their instant motions. The court stayed the deadline for plaintiff to file a motion, if any, to compel discovery from the O'Leary defendants until resolution of the motion for protective order now pending. Plaintiff nonetheless filed the instant motion to compel discovery from the O'Leary defendants, which the O'Leary defendants oppose on the same basis asserted in their instant motions.

---

[3] Defendant Rike also filed counterclaims against plaintiff for breach of contract, breach of covenant of good faith and fair dealing, and unfair claim settlement practices. The court denied defendant Rike's motion for entry of default against plaintiff on her counterclaims, premised upon plaintiff's late filing of an answer to counterclaims. (November 16, 2022, Order (DE 50) at 1-2).

[4] The O'Leary defendants originally filed pro se an answer, and the amended answer was filed following entry of appearance of counsel for the O'Leary defendants.

3

## STATEMENT OF THE FACTS

The facts alleged in the complaint,[5] as pertinent to the instant motions, may be summarized as follows. Plaintiff and defendant Rike entered into an insurance contract, effective from May 18, 2019, to May 18, 2020, (the "policy"), which provided coverage to Rike's residence at 309 S. 19th Street in Morehead City, North Carolina (the "property"). On or about October 9, 2019, Rike submitted a claim to plaintiff, "alleging that a toilet supply line leaked and caused damage" to the property on October 9, 2019 (the "water leak claim").

Plaintiff began to adjust and investigate the water leak claim, concurrently with a previous claim under an earlier policy term that had been pending since September 2018 due to damage from Hurricane Florence (the "Florence claim"). Plaintiff's investigation continued through and beyond October 2020, when Rike submitted a separate later claim for damage from Hurricane Dorian allegedly occurring on or about September 6, 2019 (the "Dorian claim").

Shortly into its investigation of the water leak claim, plaintiff received notice that Rike retained defendant Hicks as her public adjuster. Rike additionally has retained Hicks and defendant StormPro for the Florence claim and Dorian claim, as well as a claim for Florence damage to one of her business properties owned by her wholly owned business, White House Properties, Inc.

On October 1, 2020, Hicks issued to plaintiff a "demand for appraisal," pursuant to the policy's appraisal provision, which provides:

> If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent and impartial appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the "residence premises" is located. The appraisers will separately set the

---

[5] All references to the complaint in the text or "Compl." in citations are to the corrected complaint filed May 13, 2022 (DE 5) unless otherwise specified.

> amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss.
> Each party will:
> 1. Pay its own appraiser; and
> 2. Bear the other expenses of the appraisal and umpire equally.

(Compl. Ex. A (DE 1-1) at 27; see Compl. ¶ 30).[6]

In October 2020, defendant Hicks informed plaintiff that defendant Heidelberg would serve as Rike's appraiser and plaintiff thereafter named James Starrette ("Starrette") as its appraiser. Starrette and defendant Heidelberg agreed to appoint John Robison ("Robison") as the umpire for the water leak claim; however, "Robison recused himself as umpire upon learning that he was designated as Rike's appraiser for Rike's [Florence claim], which was concurrently proceeding through a separate appraisal process to set the amount of the loss." (Compl. ¶ 32). "The recusal of Robison as umpire due to his conflict of interest was known to [defendants] Rike, Hicks and Heidelberg." (Id. ¶ 33).

On March 20, 2021, defendant Heidelberg proposed that defendant O'Leary serve as the new umpire in the water leak claim appraisal, and Starette agreed. The next day, O'Leary signed a "declaration of appraisers addendum" wherein he stated:

> I, [O'Leary], accept the appointment of Umpire, and solemnly attest that I will act with the strict impartiality in the matter of differences that shall be submitted to me in connection with the above reference [sic] claim. I will decide a fair award according to the best of my knowledge, skill, and judgment. . . . I am not related to

---

[6] In citations in the text quoting the policy, page numbers specified are those appearing in the court's case management / electronic case filing (CM/ECF) system rather than the page number on the face of the underlying document. In this instance, the court quotes the appraisal provision in the policy attached to plaintiff's original complaint, filed at DE 1-1. The court notes that plaintiff quotes in its complaint part of a slightly different "appraisal" provision, with reference to its form "HO 32 32 06 12," whereas the form number on the policy attached to the original complaint bears form number "HO 00 03 05 11." (Compare Compl. ¶ 30, with Policy (DE 1-1) at 27). Because both forms are referenced in the amended policy declarations (see DE 1-1 at 11), and the differences in the appraisal provisions so quoted are not material to the court's analysis, the court adopts for purposes herein the more complete language of the appraisal provision as set forth in the form of the policy at DE 1-1, for ease of reference. The court leaves for another day further analysis of the differences in the form language, if necessary.

5

any of the parties to this Appraisal, and not interested as a creditor or otherwise in said described property or the insurance thereon.

(Compl. Ex. B (DE 1-2) at 1).

According to the complaint, undisclosed to Starrette or plaintiff, defendant O'Leary had "actively consulted and performed services on claims for [defendant] Hicks and his policyholder clients on insurance claims," and he had served predominately "as a consultant and appraiser for policyholders against insurers." (Compl. ¶¶ 37, 38). He was thus allegedly "bias[ed] towards the policyholder side of insurance disputes." (Id. ¶ 39). He was also "actively serving as a paid consultant to Rike and/or Hicks," hired by them and paid by them, for work on another "claim for Hurricane Florence damage to a property owned by White House Properties, Inc. (the 'White House Claim')." (Id. ¶ 42). According to the complaint, "[t]he failures of [defendants] O'Leary, Hicks, Heidelberg, and Rike to disclose anything about O'Leary's ongoing relationship with them and clear express bias towards Rike were willful and intended to deceive [plaintiff] into increasing the value of the [w]ater [l]eak [c]laim during [a]ppraisal." (Id. ¶ 50).

On April 21, 2021, one month after O'Leary signed on to be the umpire for the water leak claim, Heidelberg advised O'Leary that the appraisers could not agree on a valuation for the claim, and requested that O'Leary, as the umpire, settle the dispute. Over the next 11 months, between April 21, 2021 and March 15, 2022, the appraisal panel (Starrette, Heidelberg, and O'Leary) "deliberated and presented their respective positions in order to attempt to set the amount of the loss that resulted from the [w]ater [l]eak [c]laim." (Id. ¶ 52). "Most, if not all, of the [a]ppraisal [p]anel's deliberations are memorialized in writing through e-mails or letters." (Id. ¶ 53) "Not once during those [11] months did O'Leary disclose to Starrette or [plaintiff] that O'Leary was Rike's paid consultant on the White House Claim," nor that he "had an active, ongoing business relationship with Hicks or Heidelberg on other claims." (Id. ¶¶ 54-55).

6

On March 15, 2022, defendant O'Leary issued a one-page "appraisal award," signed by defendant Heidelberg the next day, which determined a total "Amount of the Loss" of $1,036,000.00, which included the following itemized amounts:

| COVERAGE | ACV of the cost to repair | Amount of the Loss[3] |
|---|---|---|
| Coverage A - Building[1] | $634,000.00 | $634,000.00 |
| - Other Coverage A [2] | $ 80,000.00 | $ 80,000.00 |
| Coverage B – Other Structures | N/A | |
| Coverage C - Contents | | $ 78,000.00 |
| - Removal, clean & sanitize, store and return | | $ 40,000.00 |
| Coverage D – Loss of Use | | $204,000.00 |

(Compl. Ex. C (DE 1-3) at 1).[7] Starette, plaintiff's appraiser, did not agree with the appraisal award and declined to sign it or agree to its contents.

According to the complaint, during the appraisal panel's deliberations, defendant O'Leary made comments and rendered opinions about his views on causation and coverage issues, which plaintiff contends was prohibited under North Carolina law. Plaintiff also alleges that defendant Hicks made statements to plaintiff, as Rike's public adjuster, about her purported "Loss of Use Claim indicating she was 'living in a camper on her front lawn.'" (Compl. ¶ 79). Plaintiff contends these statements were false and/or misleading because plaintiff later testified during an "examination under oath ('EUO')," stating that "she had not incurred any Loss of Use expenses . . . because she lived in residences she already owned." (Id. ¶ 77).

---

[7] In the table above, "ACV" refers to "Actual Cash Value." (Compl. Ex. C (DE 1-3) at 1). The referenced footnote (1) states: "The amount shown here is based upon available evidence regarding the amount spent on the overall rebuild, less the amount funded for the Hurricane Florence claim and further adjusted for the betterments minus the amount of downgrades used to cover the costs of the betterments." Footnote (2) states: "Minimum acceptable standard practice to comply with the proper workmanship standard within the policy, aka Code & Ordinance." Footnote (3) states: "Since the cost to repair is less than the ACV of the building, the cost to repair and the amount of the loss are one and the same." (Id.).

Plaintiff also contends that the appraisal is invalid because it does not explain how it accounted for "actual incurred rebuild expenses," amounts paid under the Florence claim, "Code & Ordinance," loss to "personal property," and "betterments," as well as other damages or amounts under the Florence and Dorian claims. (Compl. ¶¶ 64-70).

**COURT'S DISCUSSION**

A. Standard of Review

A motion for judgment on the pleadings is evaluated under "the same standard as a 12(b)(6) motion to dismiss." Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc., 674 F.3d 369, 375 (4th Cir. 2012). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009).[8]

B. Analysis

The O'Leary defendants argue that plaintiff's claims against them must be dismissed as a matter of law because O'Leary served as an arbitrator, thus providing the O'Leary defendants immunity from suit and discovery, and entitlement to attorney's fees, under North Carolina's

---

[8] Throughout this order, internal quotation marks and citations are omitted unless otherwise specified.

arbitration act. The court disagrees. For the following reasons, the premise of the O'Leary defendants' argument is flawed. The court begins with an overview of the pertinent provisions of the arbitration act, followed by an assessment of North Carolina law addressing appraisals and the arbitration act, concluding that the immunity and attorney's fees provisions of the arbitration act do not apply to the claims alleged.

    1.    Arbitration Act

According to the arbitration act, an "arbitrator" means "an individual appointed to render an award, alone or with others, in a controversy that is subject to <u>an agreement to arbitrate</u>." N.C. Gen. Stat. § 1-569.1(2) (emphasis added). The arbitration act, by its terms, "governs an[y] agreement to arbitrate." <u>Id.</u> § 1-569.3. "The court shall decide whether an agreement to arbitrate exists or a controversy is subject to an agreement to arbitrate." <u>Id.</u> § 1-569.6(b).

If the court finds that an agreement to arbitrate exists, then certain disclosure requirements apply to the arbitrator: "Before accepting appointment, an individual who is requested to serve as an arbitrator, after making a reasonable inquiry, shall disclose to all parties to the agreement to arbitrate . . . [a]n existing or past relationship with any of the parties to the agreement to arbitrate or to the arbitration proceeding, their counsel or representatives, a witness, or other arbitrators." <u>Id.</u> § 1-569.12(a). This disclosure is a continuing obligation, and non-disclosure "may be a ground . . . for vacating an award made by the arbitrator." <u>Id.</u> § 1-569.12(c).

The arbitration act also provides procedures for court confirmation of an award, as well as vacating an award. For example:

> Upon motion to the court by a party to an arbitration proceeding, the court shall vacate an award made in the arbitration proceeding if:
>
> (1)    The award was procured by corruption, fraud, or other undue means; [or]
>
> (2)    There was:

9

a. Evident partiality by an arbitrator appointed as a neutral arbitrator;

b. Corruption by an arbitrator; or

c. Misconduct by an arbitrator prejudicing the rights of a party to the arbitration proceeding; [or . . . .]

(4) An arbitrator exceeded the arbitrator's powers;

Id. § 1-569.23(a).

As especially pertinent to the O'Leary defendants' arguments, the arbitration act provides immunity to an arbitrator, limitations on testimony, and attorney's fees in certain circumstances. In particular, with respect to immunity, it provides an arbitrator is "immune from civil liability to the same extent as a judge of a court of this State acting in a judicial capacity." Id. § 1-569.14(a). And, "[t]he failure of an arbitrator to make a disclosure required by [§] 1-569.12 [e.g., as quoted above] shall not cause any loss of immunity under this section." Id. § 1-569.14(c). Concerning discovery, it provides an arbitrator "is not competent to testify and shall not be required to produce records as to any statement, conduct, decision, or ruling occurring during the arbitration," except that this rule does not apply to a "hearing on a motion to vacate an award." Id. § 1-569.14(d). It further provides an award of attorney's fees to the arbitrator if subjected improperly to a civil action or discovery requests, upon a court's determination of immunity. Id. § 1-569.14(e).

2. Case Law

Concerning the arbitration act and its precursor,[9] the North Carolina Supreme Court has noted that "the Arbitration Act itself is most instructive on what properly constitutes 'the

---

[9] The precursor to the arbitration act presently codified was N.C. Gen. Stat. §§ 1-567.1 to 1-567.20 (hereinafter the "prior arbitration act," repealed and replaced by the arbitration act in 2003, effective January 1, 2004), based on provisions of the Uniform Arbitration Act of 1955, and it included many provisions substantially similar to those in the current arbitration act, which is based on the Revised Uniform Arbitration Act of 2000. Cf., e.g., N.C. Gen. Stat. § 1-567.13 (2000) (providing grounds for vacating an award) and N.C. Gen. Stat. § 1-569.23 (2023) (same, with some reorganization and changes in wording). For purposes of citations to the case law, the court refers to the arbitration act and its precursor interchangeably, where differences between the two are not material to the court's analysis.

10

agreement to arbitrate' in making the determination of whether the parties in fact" agreed to arbitrate a particular issue. Nucor Corp. v. Gen. Bearing Corp., 333 N.C. 148, 153 (1992) (quoting prior arbitration act, N.C. Gen. Stat. § 1-567.11 (1983)). The court has noted that the arbitration act provides that "parties may agree in writing to submit to arbitration 'any controversy' then existing between them." Crutchley v. Crutchley, 306 N.C. 518, 522 (1982) (quoting prior arbitration act, N.C. Gen. Stat. § 1-567.2 (1981)) (emphasis added). Further, the court has noted that the arbitration act, "as enacted and codified in our statutory law is virtually a self-contained, self-sufficient code, [providing] controlling limitations upon the authority of our courts to vacate, modify or correct an arbitration award." Nucor, 333 N.C. at 155. Neither of these cases suggest that an appraisal provision not referencing arbitration constitutes an "agreement to arbitrate" under the arbitration act.

The North Carolina Supreme Court also has not applied arbitration act provisions to an insurance appraisal. It has, however, addressed a dispute over an appraisal without reference to the arbitration act. In particular, in N. Carolina Farm Bureau Mut. Ins. Co. v. Sadler, 365 N.C. 178 (2011), an insurance company brought a declaratory judgment action to invalidate an appraisal award. In that case, as here, the insured identified an appraiser,[10] and the insurance company identified its own appraiser, whereupon the insured obtained an "umpire's appointment." 365 N.C. at 180. The umpire and the insured's appraiser certified an "appraisal award," as here, which substantially exceeded the award that the insurance company's appraiser determined. Id. The insurance company then "filed a complaint for declaratory relief" in state court, contending that the appraisal award improperly failed to itemize damages and purported to determine causation

---

[10] Of note, the insured's designated appraiser in Sadler was defendant O'Leary. See 365 N.C. at 180.

11

issues, while the insured asserted counterclaims. Id. at 181. The lower court granted partial summary judgment to the insured based on the amount of the appraisal award.

In reversing the lower court judgment, the North Carolina Supreme Court noted first "the well-settled principle that an insurance policy is a contract and its provisions govern the rights and duties of the parties thereto." Id. at 182. Further, the "insurance policy both provides for and constrains the appraisal process, and that process cannot exceed the scope of the contractual provisions authorizing it." Id. The court observed that "the policy's appraisal process is limited to a determination of the amount of loss and is not intended to interpret the amount of coverage or resolve a coverage dispute." Id. at 183. "Accordingly, the trial court erred in granting partial summary judgment in favor of [the insured] because genuine issues of material fact must be resolved before the loss covered by the policy can be determined." Id. at 183-184.

In this manner, Sadler is informative to the issues presented in the instant case because it does not refer to an appraisal as an arbitration, and it does not analyze the appraisal through the terms of the arbitration act. It thus suggests that an appraisal provision, as here, must be evaluated in accordance with the law of contracts based upon the terms of the policy rather than the terms of the arbitration act. Nevertheless, Sadler does not address squarely the issues raised by the O'Leary defendants' motion, because it does not address, as here, a suit involving claims for damages against an umpire, nor the question of limitations on discovery of an umpire.

In addition, the North Carolina Supreme Court has clouded the distinction between an appraisal and an arbitration in two further respects left unresolved by Sadler. First, the court in Sadler cited to a labor arbitration case, Thomasville Chair Co. v. United Furn. Workers of Am., 233 N.C. 46, 49 (1950), albeit one arising under common law, in defining the scope of an appraisal under an insurance policy. See Sadler, 365 N.C. at 182. Second, the court, in an earlier case,

12

Young v. New York Underwriters Ins. Co., 207 N.C. 188, 176 S.E. 271, 272 (1934), referred to appraisers and an umpire, interchangeably, as "arbitrators" in a suit challenging an insurance appraisal award, also without reference to any statutory provisions. At the same time, it is notable that the umpire in Young "testif[ied] as a witness at . . . trial," id., 176 S.E. at 274, thus undercutting the O'Leary defendants' suggestion that a prohibition on discovery is warranted here.

In any event, because of the absence of any North Carolina Supreme Court case on point, the court ultimately must "look to other sources . . . for guidance as to how the Supreme Court of [North Carolina] would rule on this issue." Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 370 (4th Cir. 2005). In particular, the "court must follow the decision of an intermediate state appellate court unless there is 'persuasive data' that the highest court would decide differently." United States v. Little, 52 F.3d 495, 498 (4th Cir. 1995). In addition, the court may consider "decisions in other states." Twin City, 433 F.3d at 370.

In this instance, the O'Leary defendants' argument is foreclosed because the North Carolina Court of Appeals has decided that the provisions of the arbitration act do not apply to an insurance appraisal, and there is no persuasive data that the North Carolina Supreme Court would decide differently. In particular, in PHC, Inc. v. N. Carolina Farm Bureau Mut. Ins. Co., 129 N.C. App. 801 (1998) ("PHC"), an insured brought an action against an insurer arising out of the loss of a vehicle, asserting claims for damages for breach of contract and unfair and deceptive trade practices. The defendant insurer moved for a court-ordered appraisal under the terms of the policy, which in that case provided, similarly to the appraisal provision in the instant case, as follows:

> If you and we disagree on the amount of "loss", either may demand an appraisal of the "loss". In this event, each party will select a competent appraiser. The two appraisers will select a competent and impartial umpire. The appraisers will state separately the actual cash value and amount of "loss". If they fail to agree, they will submit their differences to the umpire. A decision, in writing, agreed to by any two will be binding. Each party will:

13

      a. Pay its chosen appraiser; and
      b. Bear the other expenses of the appraisal and umpire equally.
      If we submit to an appraisal, we will still retain our right to deny the claim.

Id. at 803-04. An umpire issued a report setting the value of the vehicle, and the case proceeded to trial where the defendant insurer prevailed on all claims, but the court granted the plaintiff attorney's fees and interest. The defendant insurer appealed the attorney's fees award and interest, arguing that "the quoted provision is an agreement to binding arbitration, so that the provisions of N.C.Gen.Stat. § 1–567.1 (1996), et seq., (Uniform Arbitration Act) apply," including that "N.C.Gen.Stat. § 1–567.11 does not allow attorneys' fees to be awarded for work performed in arbitration proceedings." Id.

      The North Carolina Court of Appeals rejected this argument, holding:

> [T]he instant case is not one involving the Uniform Arbitration Act. The policy provision quoted above provides for an "appraisal" procedure if the parties cannot agree on the amount of physical damage loss. None of the persons determining the amount of the loss are referred to as arbitrators, nor are the provisions of the Uniform Arbitration Act even obliquely mentioned.

Id. The court found "[m]ost persuasive . . . the reservation by the Insurance Company of the right to deny the claim even after submitting the amount of loss for appraisal," as well as the presence of a separate provision in the policy providing for an "arbitration procedure." Id. The court concluded: "Despite the language of the trial court, <u>the procedure set out in the policy of insurance is not arbitration within the meaning of the Uniform Arbitration Act</u> and an award of attorneys' fees pursuant to N.C.Gen.Stat. § 6–21.1 is not barred by the trial court's inadvertent reference to arbitration." Id. at 805 (emphasis added). With respect to interest, the court concluded also "defendant confuses this appraisal procedure with arbitration under the Uniform Arbitration Act." Id. at 806.

      Thus PHC confirms that an insurance appraisal is not an arbitration within the meaning of the arbitration act, based upon consideration of the plain language of the arbitration act and the

14

terms of an appraisal provision which are in many respects similar to that here. For example, neither the appraisal provision in PHC nor here includes any reference to arbitration or arbitrators. "The appraisal provisions of the insurance policy merely provide a mechanism whereby the parties can rapidly and inexpensively determine the amount of property loss without resorting to court process." Id. at 804.

The North Carolina Court of Appeals reiterated this determination in Harleysville Mut. Ins. Co. v. Narron, 155 N.C. App. 362, 364 (2002) ("Narron"), which involved an appraisal provision in a residential insurance policy that was identical to the instant appraisal provision. The plaintiff insurance company brought a declaratory judgment action as well as a claim that "the appraisal award was secured by fraud or undue means," while the insured claimed breach of contract and unfair and deceptive trade practices. 155 N.C. App. at 365. The plaintiff argued on appeal that the trial court should have treated the appraisal as an arbitration, subject to review on limited grounds.

The court rejected this argument, noting, as pertinent here, that "the appraisal in the present case was not part and parcel of an arbitration proceeding in an existing civil action where, under the [Uniform Arbitration Act], the trial court had the authority to confirm, vacate, or modify an appraisal award." Id. at 368. "Rather, the parties here invoked the appraisal process via the policy to resolve a dispute over the amount of loss, as opposed to first invoking the jurisdiction of the court in a civil action." Id. Citing PHC, the court noted "we have explicitly held that where, as here, an appraisal provision does not mandate the application of the [Uniform Arbitration Act], the Act's provisions are inapplicable." Id. Furthermore, in addressing the breach of contract claim, the court noted that "the umpire testified in his deposition" concerning the circumstances of the

appraisal, as pertinent to the plaintiff's claim of bias and impeaching circumstances. Id. at 371.[11] Thus, Narron further confirms the inapplicability of the provisions of the arbitration act to an insurance appraisal.

"Decisions in other states," consistent with PHC and Narron, also provide "guidance as to how the Supreme Court of [North Carolina] would rule on this issue." Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 370 (4th Cir. 2005). For example, in Hartford Lloyd's Ins. Co. v. Teachworth, 898 F.2d 1058, 1062 (5th Cir. 1990), the Fifth Circuit held "[u]nder Texas law it is clear that an insurance appraisal which only determines the value of a loss is not an arbitration." In In re Delmar Box Co., 309 N.Y. 60, 63 (1955), the New York Court of Appeals observed "[a] number of basic distinctions have long prevailed between an appraisement under the standard fire policy and a statutory arbitration." In Allstate Ins. Co. v. Suarez, 833 So. 2d 762, 765 (Fla. 2002), the Supreme Court of Florida held that an appraisal provision cannot be "construed as an agreement to arbitrate the underlying dispute" subject to the "formal procedures of the Arbitration Code."

The O'Leary defendants cite two cases in which the North Carolina court of appeals described an appraisal as "analogous to an arbitration proceeding." N. Carolina Farm Bureau Mut. Ins. Co. v. Harrell, 148 N.C. App. 183, 187 (2001) ("Harrell"); Enzor v. N. Carolina Farm Bureau Mut. Ins. Co., 123 N.C. App. 544, 546 (1996) ("Enzor"). Neither case, however, provides persuasive data the North Carolina Supreme Court would rule differently from PHC or Narron. As an initial matter, Narron expressly addressed the recognition in Harrell and Enzor that an appraisal is "analogous to an arbitration proceeding," but followed the more specific holding in PHC that "where, as here, an appraisal provision does not mandate the application of the [Uniform

---

[11] Again of note, as in Sadler, discussed previously, defendant O'Leary was the designated appraiser for the insured in Narron. See, e.g., 155 N.C. App. at 371.

16

Arbitration Act], the Act's provisions are inapplicable." Narron, 155 N.C. App. at 368. There is also good reason to limit Enzor and Harrell to their facts, because neither case involved a challenge by the parties concerning whether the provisions of the arbitration act applied to an appraisal. Indeed, Enzor and Harrell did not address immunity, nor a claim for damages, only a claim to vacate an appraisal award.

For example, the O'Leary defendants rely upon the following quoted passage from Harrell in urging the court to apply the provisions of the arbitration act:

> While there is no allegation of fraud or duress, plaintiff contends there was an "impeaching circumstance" in that the umpire considered the amount of insurance coverage and awarded the salvage to defendant. We note arbitrators are not required to articulate reasons for their award. Howell v. Wilson, 136 N.C.App. 827, 526 S.E.2d 194, rev. denied, 352 N.C. 148, 544 S.E.2d 224 (2000). . . . Because plaintiff is unable to show a violation of N.C. Gen.Stat. § 1–567.13 or impeaching circumstances, we reject his [sic] argument and affirm the trial court.

(Defs' Reply (DE 66) at 2) (quoting Harrell, 148 N.C. App. at 186-87)) (emphasis and material in brackets added). In Harrell, the plaintiff insurer moved to "vacate an umpire's award," itself expressly "alleging the award was in violation of the insurance policy and that the umpire acted outside the scope of his authority, in violation of N.C. Gen. Stat. § 1-567.13."[12] Harrell, 148 N.C. App. at 183-84 (emphasis added). Where the insurer itself asked the court to vacate an award on the basis of a provision in the arbitration act, and there was no issue raised by either party as to the applicability of the arbitration act to an appraisal, Harrell is not helpful for discerning controlling North Carolina law on the issue presented in the instant case, particularly where PHC addresses the issue more directly.

---

[12] The provision cited, from a precursor to the arbitration act, required a court to vacate an arbitrator's award when "[t]he arbitrators exceeded their powers," N.C. Gen. Stat. § 1-567.13(a)(3) (2000), which is similar to the current version of the arbitration act that requires a court to vacate an arbitrator's award when "[a]n arbitrator exceeded the arbitrator's powers." N.C. Gen. Stat. § 1-569.23(a)(3).

17

Other cases cited by the O'Leary defendants are inapposite. For example, they cite to Dalenko v. Collier, 191 N.C. App. 713 (2008), for the proposition that "[p]rivate citizens acting as arbitrators are afforded judicial immunity when performing the function of resolving disputes between parties, or of authoritatively adjudicating private rights." (Defs' Mem. (DE 61) at 6 (citing Dalenko, 191 N.C. App. at 722–23)). Dalenko, however, is inapposite, and the proposition cited is beside the point, where the parties there "consented to submit their disputes to binding arbitration, and their agreement provided that: 'The arbitration award shall be binding as an official court ordered judgment and shall be final as to all claims.'" Dalenko, 191 N.C. App. at 715. By contrast here, absent any arbitration reference in the policy, there is no basis in the instant case to find that the parties consented at any point to "binding arbitration," nor an "arbitration award . . . binding as an official court ordered judgment." Id. Furthermore, while Dalenko suggests conceivably an expansion of North Carolina public policy to afford appraisers "judicial immunity," this court sitting in diversity "should not create or expand a State's public policy," particularly with "an uncertain and ephemeral interpretation of state law." Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007).

The O'Leary defendants also cite Turner v. Nicholson Properties, Inc., 80 N.C. App. 208, 208 (1986), and Glendale LLC v. Amco Ins. Co., No. 3:11-CV-3-RJC-DCK, 2012 WL 2917920 at *3 (W.D.N.C. July 17, 2012),[13] as an examples of cases in which the court "rejected insurer claims that 'associational' relationships comprise an objective basis for a reasonable belief that misconduct had occurred on the part of an arbitrator." (Defs' Reply (DE 66) at 3). On the one

---

[13] The O'Leary defendants reference the corresponding citation at 2012 U.S. Dist. LEXIS 98758 *8-10.

18

hand, Turner is inapposite because it addressed expressly a controversy subject indisputably to arbitration. See, e.g., Turner, 80 N.C. App. at 208 (noting "arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association").[14] On the other hand, Glendale is unhelpful because it does not involve application of the arbitration act in evaluating a challenge to an appraisal. See Glendale, 2012 WL 2917920, at *3. In either event, Turner and Glendale are not determinative on issues of immunity and attorney's fees raised by the instant motions. Whether plaintiff can prevail ultimately on its claims based upon defendant O'Leary's alleged failure to make adequate disclosures is an issue the court leaves for another day upon a more complete record. See, e.g., id. (holding upon summary judgment motion that the "[p]laintiff has not presented any evidence that [the appraiser's] later work with [the other appraiser] affected his neutrality in this case").

In sum, plaintiff has not demonstrated that the immunity provisions and the attorney's fee provision of the arbitration act apply, as a matter of law, to the O'Leary defendants. Accordingly, the O'Leary defendants' motions for judgment on the pleadings, for protective order, and for attorney's fees, premised upon application of the same, must be denied.[15]

B.      Motion to Compel

Plaintiff seeks an order directing the O'Leary defendants "to serve complete answers and responses to Plaintiff's First Set of Written Discovery Requests," specifically "Interrogatory no.

---

[14] Turner further is distinguishable from the instant case because the litigants there "had ample opportunity at the arbitration hearing to explore the nature of the arbitrator's association with claimant's counsel." 80 N.C. App. at 211 (emphasis added). This demonstrates why Turner is unhelpful in the instant case where there was no such "arbitration hearing" at which the parties could explore defendant O'Leary's associations. It also illustrates why the appraisal process set forth in the policy should not be evaluated under the same rules as an arbitration under the arbitration act.

[15] Because the court denies the O'Leary defendants' motions on this basis, the court does not reach plaintiff's additional argument that the O'Leary defendants waived some parts of their motions by filing an answer without asserting arbitration as an affirmative defense and by participating in discovery.

19

14 and Requests for Production nos. 18 and 21," within 14 days. (Pl's Mot. (DE 70) at 3; Pl's Mem. (DE 70-1) at 11). Where the O'Leary defendants have opposed the motion solely on grounds of their statutory immunity, (see Defs' Opp. (DE 71) at 3-5), the court accordingly compels the discovery sought also on the basis of the preceding analysis. The court will allow the O'Leary defendants, however, 30 days to serve the subject discovery responses, given the detailed nature of the requests.

## CONCLUSION

Based on the foregoing, the O'Leary defendants' motions (DE 58, 59, 60) are DENIED, and plaintiff's motion to compel (DE 70) is GRANTED on the terms set forth herein. The O'Leary defendants are DIRECTED to serve complete answers and responses to plaintiff's First Set of Written Discovery Requests, specifically Interrogatory no. 14 and Requests for Production nos. 18 and 21, within 30 days of the date of this order.

SO ORDERED, this the 12th day of October, 2023.

_____
LOUISE W. FLANAGAN
United States District Judge